```
                   UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
```

| | |
|---|---|
| **Albert Walton,** : | |
|     **Plaintiff,** : | |
| : | |
| **v.** : | Case No. 3:03cv2262 (JBA) |
| : | |
| **State of Connecticut,** : | |
| **Department of Social Services,**: | |
|     **Defendant.** : | |

**Ruling on Defendant's Motion for Summary Judgment [Doc. # 23]**

Plaintiff Albert Walton instituted this action against defendant State of Connecticut Department of Social Services ("DSS") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., alleging racial discrimination on the part of defendant in its failure to promote plaintiff to the position of Eligibility Services Supervisor in the DSS office in Waterbury, Connecticut.[1] See Complaint [Doc. # 1]. Defendant now moves for summary judgment arguing that no disputed issue of material fact exists as to whether plaintiff was discriminated against on account of his race when he unsuccessfully sought a

---

[1] Plaintiff's Complaint contains allegations of discrimination on the basis of both race and gender. See Complaint [Doc. # 1] at ¶ 1. Subsequent to filing his complaint, plaintiff abandoned his gender discrimination claim and, notwithstanding plaintiff's occasional reference to "sex discrimination" in his papers, plaintiff will be held to his discontinuance of that claim. See Email from John R. Williams to Edward F. Osswalt, dated April 22, 2005 [Doc. # 34, Ex. A] (acknowledging that plaintiff's counsel represented on the record before the Court that he was "not pursuing the sex claim").

1

promotion to the position of Eligibility Services Supervisor. See Motion for Summary Judgment [Doc. # 23]. For the reasons that follow, defendant's motion is denied.

## I.   FACTUAL BACKGROUND

Plaintiff Walton is an African American male who at all times relevant to this action was employed by DSS. See Complaint ¶¶ 3, 6. Plaintiff began working for the predecessor agency of DSS in 1981 as an energy assistance worker. Deposition of Albert Walton ("Walton Dep.") [Doc. # 26, Exhibit. 1] at 13, 14. Plaintiff was appointed to the permanent state classified service in 1982 after successfully completing a probationary period in the Connecticut Career Trainee program. Agmt. Def's L.R. 56(a)(1) Stmt. [Doc. # 25] at ¶ 5; Walton Dep. at 19. Plaintiff received a promotion to the position of lead eligibility services worker in the Waterbury DSS office in 1992 and worked in that position through August 2000 in the case maintenance unit supervised by Eligibility Services Supervisor Pearl Byrd, an African American female. Walton Dep. at 18-20, 40; Affidavit of John C. Souchuns ("Souchuns Aff.") [Doc. # 26, Ex. 2] at ¶ 9. Between October 1995 and March 2004, the Waterbury DSS office was under the general supervision of two Co-Field Operations Managers, John Souchuns, a Caucasian male, and Bonnie L. Wilkes, a Caucasian female. See Souchuns Aff. at ¶¶ 4-5; Affidavit of Bonnie L. Wilkes ("Wilkes Aff.") [Doc. # 26, Ex. 3] at ¶ 5.

In August of 2000, plaintiff's supervisor, Pearl Byrd, then under the supervision of Mr. Souchuns, was arrested on charges of fraud as a result of an investigation undertaken by DSS's Quality Assurance Unit and was ultimately terminated. See Walton Dep. at 41-42; Souchuns Aff. at ¶¶ 11; Wilkes Aff. at ¶ 13.  Pursuant to "standard procedure," Mr. Souchuns and Ms. Wilkes appointed plaintiff, as second-in-command of the unit, interim supervisor pending a competitive selection process to permanently fill the vacancy left by the termination of Ms. Byrd. See Walton Dep. at 64-65; Souchuns Aff. at ¶ 12; Wilkes Aff. at ¶ 13.  A couple of months earlier, in June or July of 2000, the Eligibility Services Supervisor of a client intake unit under Ms. Wilkes' supervision retired, also creating an Eligibility Services Supervisor vacancy. See Souchuns Aff. at. ¶ 13; Wilkes Aff. at ¶ 11.  As was the case with plaintiff's unit, the client intake unit's second-in-command, Cornelius (Neil) Coughlin, a Caucasian male, was appointed Interim Supervisor pending a competitive selection process to appoint a permanent supervisor for the unit. See Souchuns Aff. at ¶ 13; Wilkes Aff. at ¶ 12.

In February 2001, DSS began its competitive selection process to fill the two Eligibility Services Supervisor vacancies in Waterbury by posting a notice in DSS offices statewide that eligible and interested employees should submit applications and/or resumes. See Vacancy Notice [Doc. # 26, Ex. 4]; Souchuns

3

Aff. at ¶ 14; Wilkes Aff. at ¶ 14. The Department of Administrative Services screened each application to ensure that each applicant met the minimum qualifications established for the positions; a total of 26 applicants met the qualifications and were scheduled for further review and evaluation.[2] See Walton Dep. at 48-50; Souchuns Aff. at ¶¶ 15-16; Wilkes Aff. at ¶ 16. Souchuns and Wilkes were appointed to review and evaluate each applicant and recommend to the Regional Administrator, Sandee Sorel-Leduc, the two most qualified candidates to fill the two vacancies. See Souchuns Aff. at 15; Wilkes Aff. at ¶ 15. The evaluation process[3] included an interview consisting of a set of questions developed collaboratively by Souchuns and Wilkes that were designed "to elicit responses that would permit assessment

---

[2] The qualified applicant pool consisted of: one African American male (plaintiff), one African American female, seven Caucasian males, fifteen Caucasian females, and two males listed as "Other" (e.g., Native American, Asian). See Affirmative Action Applicant Flow Report [Doc. # 26, Ex. 5].

[3] Plaintiff offers no evidence disputing defendant's description of this process design. As opposed to admitting or denying each statement of fact in defendant's Local Rule 56(a) Statement, plaintiff claims insufficient knowledge to respond to many of the statements, including this one. As defendant notes, Local Rule 56(a)(2) requires the non-moving party to admit or deny each statement and to include after each denial a citation to an affidavit or other evidence that would be admissible at trial. See L.R. 56(a)(2)-(3). Accordingly, because plaintiff has not denied these assertions of fact, and has offered no evidence to dispute their accuracy, they will be accepted as undisputed. See Local Rule 56(a)(1) ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)(2).").

4

of the candidate's knowledge of the job functions and responsibilities and to [assess] the candidate's technical competence, motivation, judgment and interpersonal skills." See Def. L.R. 56(a)(1) Stmt. at ¶¶ 23-24 (citing Souchuns Aff. at ¶¶ 16-17; Wilkes Aff. at ¶ 18); Eligibility Services Supervisor Interview Questions [Doc. # 26, Ex. 6]. It is undisputed that Souchuns and Wilkes considered each applicant's responses to the questions posed at the interviews and thereafter prepared "typed joint rating forms for each [applicant's] interview and forwarded these forms to Ms. Sorel-Leduc along with their recommendations as to the most qualified candidates." Def. L.R. 56(a)(1) Stmt. at ¶ 25 (citing Souchuns Aff. at ¶ 18; Wilkes Aff. at ¶ 19).

Souchuns and Wilkes rated plaintiff's responses to the interview questions as "unacceptable" in two evaluation categories, "marginal" in two categories, and "acceptable" in one category; the overall rating assigned to plaintiff was "unacceptable." See Souchuns Aff. at ¶ 19; Wilkes Aff. at ¶ 21; DSS Candidate Summary Form, Albert Walton [Doc. # 26, Ex. 7]. Souchuns and Wilkes testified that:

> [P]laintiff['s] responses were deficient in that he failed to mention how the agency's Core Values could best be promoted, i.e., by example and in daily interaction with co-workers. In regard to supervisor functions, plaintiff failed to mention in his responses that a supervisor must motivate his or her staff. Plaintiff's responses also did not touch upon the fact that the overall needs of the agency were paramount and that the needs of an individual unit must be subordinate. Plaintiff also neglected to mention that

> a supervisor must give his staff clear expectations
> regarding work requirements and convey to his staff the
> importance of teamwork to attain agency objectives.
> Plaintiff failed to mention a supervisor's ultimate
> responsibility to carry out the agency's (management's)
> objectives and the need to both support and promote
> those objectives.

Souchuns Aff. at ¶ 20; accord Wilkes Aff. at ¶ 22.  Plaintiff disputes the significance of these omissions as a basis for his negative performance evaluation and refers to the Connecticut Commission on Human Rights and Opportunities ("CHRO") Reasonable Cause Finding, indicating that plaintiff documented "his understanding of a supervisor's role," and "served on the Committee which drafted the Statement of Core Values."  Pl. L.R. 56(a)(2) Stmt. [Doc. # 30] at ¶ 28 (citing Ex. B (CHRO Reasonable Cause Finding), ¶ 11).

In contrast to plaintiff's interview ratings, two other candidates – Douglas Church and Neil Coughlin – received overall ratings of "excellent" and were ultimately hired for the supervisor positions, Church in the case maintenance unit in which plaintiff worked, and Coughlin in the eligibility unit of which he was acting interim supervisor.  See Souchuns Aff. at ¶ 12; Wilkes Aff. at ¶ 23; DSS Candidate Summary Forms, Douglas Church, Cornelius Coughlin [Doc. # 26, Ex. 7].  At the time of their promotions, Church had approximately 14 years of experience with DSS and Coughlin had approximately 25.  See Forms PLD-1, Douglas Church, Cornelius Coughlin [Doc. # 26, Ex. 8].  Plaintiff

had 20 years of experience with DSS.

In addition to the interviews, as part of the evaluation process Souchuns and Wilkes reviewed Eligibility Management System ("EMS") reports for all applicants. Defendant explains that these reports are "regularly monitored by supervisors in DSS as a means by which both individual and unit productivity can be measured." Def. L.R. 56(a)(1) Stmt. at ¶ 37 (citing Souchuns Aff. at ¶ 22; Wilkes Aff. at ¶ 25). The EMS reports documented overdue work in plaintiff's unit and in plaintiff's individual caseload. See Souchuns Aff. at ¶ 23; Wilkes Aff. at ¶ 25. Plaintiff contends that because comparison of the EMS report results is misleading,[4] defendant's reliance on them is misplaced and pretextual, although plaintiff does not dispute that his number of EMS "alerts" (indicators of overdue work) was numerically higher than those of the other candidates, including Church and Coughlin, who were among the applicants with the fewest number of such "outstanding delinquencies" in their individual caseloads.[5] See Souchuns Aff. at ¶ 23; Wilkes Aff. at

---

[4] Plaintiff's basis is that: (1) the two applicants ultimately selected for the positions, Church and Coughlin, had differing workloads from plaintiff; (2) the high volume of overdue work in plaintiff's unit was attributable to the failings of its prior supervisor, Ms. Byrd, not plaintiff; and (3) Souchuns never expressed any concern regarding the volume of overdue work to plaintiff during the eight months that plaintiff was interim supervisor.

[5] Defendant also submits evidence showing that in April 2001 one of the EMS reports listed 89 pending overdue actions

7

¶ 25; Alerts Listing [Doc. # 26, Ex. 9] (indicating that plaintiff had 18.5 pages of alerts, whereas the next closest applicant had 10 pages of alerts).  Defendant also contends that "Church was motivated enough to submit . . . letters of recommendation" and that no such letters were received in connection with plaintiff's application.  See Souchuns Aff. at ¶ 25.  Defendant does not show that letters of recommendation were either required or suggested as part of the application process.

## II.  STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law."  Rodriguez v. City of N. Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).

---

with respect to cases in the unit plaintiff had been temporarily supervising since August 2000, whereas in August 2001, several months after Church was promoted to unit supervisor, the number of overdue actions in the report had been reduced to 22.  See Souchuns Aff. at ¶ 24; New Hires Report [Doc. # 26, Ex. 11]. This evidence of Church's efficacy is post-decision, and could not have formed the basis for the decision, and is therefore not relevant.

"The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Id. (citations omitted). "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "A defendant need not prove a negative when it moves for

summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").  In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion.  Matsushita, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient.  Matsushita, 475 U.S. at 586 (citations omitted).

**III. DISCUSSION**

**A.   Title VII Framework**

As the parties agree, this Title VII employment discrimination case should be analyzed under the McDonnell Douglas/Burdine three-prong burden-shifting framework. Under that framework, plaintiff first must establish a prima facie case of discrimination on account of race. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). To do so, he must prove: (1) membership in a protected class; (2) qualification for his position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class. See e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

If plaintiff establishes a prima facie case, the burden shifts to defendant "to produce evidence that the plaintiff was [not promoted] for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing, 530 U.S. 133, 142 (2000) (internal citations, quotations, and alterations omitted). It is satisfied if the proffered evidence "'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000) (quoting St. Mary's

11

Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). "Although the burden of production shifts to the defendant, the ultimate burden of persuading the trier of fact of intentional discrimination remains at all times with the plaintiff." Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997).

If DSS articulates a race-neutral basis for its failure to promote plaintiff, the burden then shifts back to plaintiff to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42. The plaintiff "may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." Reeves, 530 U.S. at 143. Thus, a plaintiff's prima facie case combined with sufficient evidence to find that the defendant's proffered justification is pretextual will be sufficient to survive summary judgment because a jury would be permitted to infer from such evidence that defendant's real reason for the employment action was discriminatory. Id. at 148.

**B.   Prima Facie Case**

"The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997). In this case, plaintiff has established a prima facie case of race

discrimination. The first three elements are not disputed. See Def. Mem. of Law in Support of Motion for Summary Judgment [Doc. # 24] at 10. Plaintiff is an African American, he was qualified for the position of Eligibility Services Supervisor, and was not promoted to that position. Plaintiff has also satisfied the fourth element of his prima facie case because it is undisputed that the open positions were filled by non-African American individuals (Coughlin, a Caucasian male, and Church, a Native American male). See Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 129 (2d Cir. 1996) (evidence that the position was filled by an individual outside of plaintiff's protected class was sufficient to satisfy the fourth element of a prima facie case of discrimination).

**C.   Pretext**

Defendant has met its burden of articulating legitimate non-discriminatory reasons for its failure to promote plaintiff, namely plaintiff's poor interview performance, the large number of EMS "alerts" attributable to both plaintiff individually and the unit he was supervising, and his failure to submit recommendation letters in connection with his application. Once a defendant proffers nondiscriminatory reasons for an adverse employment action, the third step in the burden-shifting framework requires "a case-by-case analysis, with a court examining the entire record to determine whether the plaintiff

could satisfy his [or her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"  <u>Schnabel</u>, 232 F.3d at 90 (2d Cir. 2000) (quoting <u>Reeves</u>, 530 U.S. at 143).  The Supreme Court in <u>Reeves</u> stated that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated" but also observed that "[t]his is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability."  <u>See</u> 530 U.S. at 148.  Thus, "[t]o defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  <u>Terry v. Ashcroft</u>, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation and citation omitted).

Drawing all inferences from the summary judgment record in plaintiff's favor, the Court finds that there is minimally sufficient evidence from which a jury reasonably could conclude that defendant's reasons given for not promoting plaintiff were not credible.  First, defendant's primary stated reason for promoting Coughlin and Church instead of plaintiff is plaintiff's "unacceptable" performance in his interview, particularly when

14

compared with the "superior" interview performance by both Coughlin and Church.  See Candidate Summary Form [Doc. # 26, Ex. 7].  The interview ratings were based on four levels of ratings in six categories which largely require the interviewer's subjective assessment ("Technical Competence," "Motivation," "Judgment," "Interpersonal Skills," "Responsiveness to Questions," and "Overall Evaluation").  One of the areas in which Souchuns and Wilkes rated plaintiff in the worst category, "unacceptable," was his discussion of DSS core values.  See Souchuns Aff. at ¶ 20; Wilkes Aff. at ¶ 22.  Plaintiff contends that Souchuns' and Wilkes' evaluation of him was unjustifiably negative given that they knew he had the requisite knowledge, based on his substantial experience and Core Values Committee membership, to adequately respond to the questions.  See Pl. L.R. 56(a)(2) Stmt. at ¶ 28 (plaintiff was a member of the Core Values Committee, helped formulate, organize and promote the Core values for the department, and had knowledge and understanding of the functions of an effective supervisor); Walton Dep. at 52-53 (disagreeing with his interview ratings and stating "[t]hey're saying that I didn't have an understanding of core values.  And I was on the Core Values Committee.  So, I thought it was a little ridiculous for them to say that, because they were on the same committee that I was that formulated core values").

In addition, notwithstanding the fact that degree of

seniority was not listed as a consideration for selection so long as the applicant met the prerequisite of seven years of experience, see Vacancy Notice [Doc. # 26, Ex 4], the record shows no attention given to the fact that plaintiff had twenty years of experience at DSS, including nine months acting in the very position to which he sought to be promoted (during which time he was never criticized or removed from that position), whereas Church had only fourteen years of experience and had never been a supervisor. See, e.g., Zakre v. Norddeutsche Landesbank Girozentrale, 396 F. Supp. 2d 483, 509 (S.D.N.Y. 2005) (issue of fact as to whether plaintiff had stronger qualifications for the position than the person selected, inter alia, precluded summary judgment, noting "[t]he Second Circuit has found in cases such as this that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision") (citing Byrnie v. Town of Cromwell, 243 F.3d 93, 103 (2d Cir. 2001)).

Further, plaintiff argues that defendant's claimed reliance on the number of ETS "alerts" attributable to him was pretextual and did not accurately reflect relative performance or qualifications. Plaintiff contends that DSS had never previously criticized him about the computer alerts prior to his CHRO complaint, see Walton Dep. at 58-59, and that DSS tolerated

alerts remaining active in the system for as long as five years, see Alert Policy Email [Doc. # 30, Ex. E]. Plaintiff also explains that the high number of alerts for his unit was due to the failures of its prior supervisor, Ms. Byrd, and the high number of alerts attributable to plaintiff individually was due to the fact that during the time when he was serving as acting supervisor, he continued to perform his duties as lead eligibility services worker. See Walton Dep. at 44, 57; Plaintiff's Responses to Defendant's Interrogatories [Doc. # 30, Ex. F] at ¶ 7.

Plaintiff rebuts defendant's claim that Church was more favorably reviewed because he supplied letters of recommendation whereas plaintiff did not as a pretextual "reason" because there was no requirement to submit such documentation and he would have done so upon request. Pl's L.R. 56(a)(2) Stmt. at ¶ 45. Plaintiff states that Souchuns and Wilkes "were well aware of [plaintiff's] volunteer efforts, since [he] was selected to work with FEMA, and to set the agenda and participate in the statewide 'Core Values' Committee, among other things." Pl. Opp. at 5 (citing Plaintiff's Responses to Defendant's Interrogatories at ¶ 6); see also Walton Dep. at 61.

Thus, considered collectively the evidence in the record viewed in the light most favorable to plaintiff – including that plaintiff had more seniority and relevant supervisory experience

than Church, that plaintiff possessed satisfactory job understanding from his active participation on the Core Values Committee, that the high number of plaintiff's ETS "alerts" was attributable to causes other than plaintiff's own abilities or performance, and that Souchuns and Wilkes were aware of his volunteer activities – could support an inference that the ratings of "unacceptable" were pretextual.  The plaintiff is entitled to have his evidence submitted to a jury to determine whether DSS's proffered reasons for its failure to promote plaintiff are pretextual and a proxy for discrimination.[6]  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) (the proper inquiry for the Court at this stage is "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.  It is not the province of the summary judgment court itself to decide what inferences should be drawn").

**IV.   CONCLUSION**

For the foregoing reasons, defendant's Motion for Summary

---

[6] Plaintiff also argues that "the fact that no black male has ever been promoted to a supervisor position [at the DSS office] in Waterbury raises a question of illegal discrimination targeted at this class of employees within the Social Services Department." Pl. Opp. at 6.  However, two African-American women have been supervisors at the Waterbury DSS office, and plaintiff has dropped his gender discrimination claim, and this fact contributes only minimally to plaintiff's showing of intentional race discrimination.

Judgment [Doc. # 23] is DENIED.

                                 IT IS SO ORDERED.

                                         /s
                                Janet Bond Arterton
                                United States District Judge

**Dated at New Haven, Connecticut this 2nd day of March, 2006.**